Good morning, and may it please the Court. Daniel F. Blanchard on behalf of the appellant Edward Terry, who was also the defendant in the District Court action. Mr. Terry is a real estate developer who resides in Florida. He has offices in Georgia and Florida. Plaintiff CresCom Bank sued Mr. Terry to collect multiple personal guarantees involving several real estate developers. Mr. Terry has appealed against CresCom Bank to CCT Reserve LLC, which is an entity that Mr. Terry had owned. The District Court granted a summary judgment in the bank's favor and awarded a judgment of approximately $2.17 million against Mr. Terry. Mr. Terry appealed from that judgment. We are here on de novo review. CresCom has cross-appealed the District Court's refusal to award attorney's fees. I am going to apologize to the Court. I am suffering from a rather difficult cold and my voice is kind of cracking and going dry. In the appeal, Mr. Terry has essentially made six primary issues or arguments which we believe justify reversing our overturning the District Court's order. The first issue is that Mr. Terry's liability under the guarantee agreements was completely discharged because of the bank's fear to provide him with written notice of default and an opportunity to secure the default in accordance with the terms of the contracts, either to which he was a party individually or as guarantor or because he was an intended third-party beneficiary of the notice of default provision. The second issue we raised in the appeal was that the loan debt, that is at issue in this case, was satisfied in full when CCT, as part of the Northern District of Georgia, conveyed very valuable real estate to CresCom Bank, which we believe exceeded the amount of the outstanding loan amount, or at least the District Court erred in granting summary judgment to the bank because the evidence if construed in the light most favorable, Mr. Terry would have shown that the value of the property was more than what the debt was. The third issue is that based on the expressed terms of the confirmed bankruptcy plan that CresCom participated in and did not appeal from and provisions of 11 U.S.C. section 1141 and principles of collateral estoppel raise judicata, that the maximum liability that Mr. Terry could be found liable for under the guarantees is approximately $1.21 million, which is the amount that the bankruptcy court held remained unsatisfied after CCT had surrendered or conveyed its collateral to the bank as part of the bankruptcy proceedings. The fourth issue is that the District Court's award of Which one do you want to talk about? I apologize, Your Honor. I wasn't sure whether I needed to give a synopsis of what the issues are. The first issue involving the notice of default, essentially what that boils down to, there were a series of agreements that the parties executed in June of 2009, including a loan commitment letter, an addendum to that, and then an amendment to all of the loan documents, which included three previous loans that had been made Is this the notice argument? Yes, it is, Your Honor. Yes, but there is nothing in the agreement that he had that required the bank to give him notice, right? No, Your Honor. There was a loan commitment letter that was executed on, I think, June 25, 2009, to which Mr. Terry was a party to that, and it included a notice of default provision. What about with respect to the guarantee? Well, Was there any obligation under the guarantee agreement that he be given notice? The specific preprinted guarantee form did not include a notice of default provision, but the loan commitment letter to which Mr. Terry signed individually and as guarantor has a provision that says that its provisions are binding on the parties and survive the loan closing. And so our position has been that that document was a contract which required notice of default to be given to Mr. Terry. It survived the loan closing, including the guarantee agreements, the preprinted forms, that that contract required that notice of default be given to Mr. Terry, which did not occur. Mr. Blanchard, I think you argued that your client actually specifically negotiated notice as a precondition of signing the guarantees. Wouldn't there have been a much more efficient way of doing that than the opaque language that is included in these documents? Well, I think from his perspective, he thought that the language was clear, that it was required to be given notice of default. Well, but the language that you rely on defines borrower for all purposes, not just for purposes of notice, and clearly he was not the borrower under the terms of these loans. I think that's incorrect, Your Honor. The loan commitment letter defines borrower to include not only the primary obligor, but also sureties, grantors, and other obligors. And I think under the law, a surety is the same thing as a guarantor. And so it was defined I don't dispute that, but you're not suggesting that your client, Mr. Terry, was the actual borrower under these documents. Well, I think what the document is doing, it is saying that the term borrower can encompass the guarantor. And so our position But that was required to encompass it for all purposes under the documents, and I don't think that's correct. Well, I think it, I guess that argument could be made. We were not making that argument, and I don't think the bank was making that argument. Our point was simply that there were a series of loan documents. Some of them are preprinted forms. Some of them are not standardized forms. They were documents that were specifically negotiated, specifically tailored to deal with this situation. And I didn't mention earlier, and I should have, is what happened in June of 2009 is that there were three loans that were already out there. And as part of this, a new loan made at that time, the bank demanded that Mr. Terry sign a cross-default and cross-collateralization agreement, which essentially allowed the bank to say that if any one of these loans goes into default, then all four of them are in that new requirement. That's when Mr. Terry said, well, if you're going to have that requirement, then I want to have a notice of default provision. And that was part of this nonstandardized document that was signed by the bank, by Mr. Terry, and the primary borrower, CCT. So our position is that to the extent that there may be a conflict between that nonstandardized document and the standardized preprinted forms, which do contain boilerplate and fine print on the back, that you should find in that situation where there's a conflict that the nonstandardized forms govern. And that document includes a notice of default provision. That's all we're saying, really, on that issue. The third issue is the question of whether or not, what effect should the Bankruptcy Court's confirmation of CCT's bankruptcy plan have? And essentially what our argument was on that question is that in the Bankruptcy Court, when CCT conveyed or surrendered valuable property to Crescom, the lender, the Bankruptcy Court put a value on that property and said, here's what it is. Now, the court there did not use fair market value. The bank itself had argued that in the context of a bankruptcy proceeding, the court should use a liquidation or fire sale value. The Bankruptcy Court put a very conservative number of value on that $1.5 million. The Bankruptcy Court then said, under the approval or confirmation of the bankruptcy plan, that if there's a difference between the value of that property and what the bank's claim is, that that difference will be treated as an unsecured claim in the bankruptcy plan and there will be payments that will be made towards that claim. There's also provision in the plan which was confirmed by the Bankruptcy Court that says that unless otherwise provided, any other claims are satisfied or released. And so our position has been that the maximum liability that Mr. Terry could face is $1.21 million, which is the amount that the Bankruptcy Court held was unsatisfied when the bank received the property that was surrendered to it minus its full claim. But what the District Court held was that that order was not binding on Crestcom and that Crestcom could go into the District Court and say, no, we didn't present all of our damages or we didn't present all of the things we wanted to present in support of our award and our damages really are $2.2 million. Well, the order was binding, but only as against CCT. It wasn't binding against the guarantor. That's all that the District Court concluded, it seems to me. Well, it wasn't binding against the guarantor, but it was also binding against the creditor, the bank. Right, as against the debtor, but not as against the guarantor who independently signed an agreement to make itself liable for any and all damages, awards, attorney's fees, etc., that it might incur as a result of the guarantee. I think that's incorrect, Your Honor. The provision of the Bankruptcy Code 11 U.S.C. 1141 states that that confirmed bankruptcy plan is binding on the lender, the creditor, even if it objected to the plan. That's exactly what Judge Dias just said. It's binding on the creditor. The creditor is the person that's bankrupt. For all purposes. It doesn't say that it's only binding for purposes of the bank. Mr. Terry was not a party to the bankruptcy proceedings is the point. He wasn't a debtor and so there's nothing inconsistent with saying that the order is binding as against the creditor for all purposes and allowing the bank nonetheless to pursue the agreement with respect to the guarantee and pursue its debt under the guarantee. Maybe I should try to clarify. The effect of 11 U.S.C. 1141 is simply codifying principles of collateral estoppel res judicata. It's the general rule. It says that the confirmed bankruptcy plan is binding on the creditor. So Mr. Terry obviously was not a party individually to the bankruptcy proceeding, but under the principle of non, there's no mutuality requirement to apply collateral estoppel anymore. So even though Mr. Terry was not a party to the proceeding, he can use the results of that proceeding against the bank because it was a party to the proceeding and it did litigate those issues and it did not appeal from the bankruptcy court's orders. And what's your best case for the use of defensive non-mutual collateral estoppel in the bankruptcy context? I think we cited several cases, Your Honor, in our brief. What's your best case? The Weaver case we cited. Let me see if I can find the actual. Apologize, Your Honor. That's all right. It's at page 31 of your brief. The Weaver case, the Rosewood at Providence LLC case, the Park Forest Development case, all those cases involve this provision of the bankruptcy code we're talking about. The issue that the district court went off on is it said, it didn't disagree with our analysis about the general preclusive effect of a bankruptcy court order even as to a creditor, but what it said was is that there's another section of the bankruptcy code, 11 U.S.C. Section 524E, and that section says that the mere fact that the bankrupt debtor has been discharged as part of the bankruptcy process does not affect or reduce the liability of a non-debtor, such as a guarantor. We are not arguing that. We are not arguing that Mr. Terry's liability was affected simply because CCT was discharged as part of bankruptcy. What we're saying is that as part of that bankruptcy, CCT conveyed or surrendered valuable property to the bank, which partially at least, if not fully, satisfied the bank's claim. And that does not implicate 524E at all. And so all we're saying here is that if the bankruptcy court said, here's the bank's claim, we're going to credit or set off against that claim the amount of the property that it received, and here's what's left. The bank didn't appeal those rulings. And so we're saying the bank found, the bank's claim was determined in bankruptcy court, and here's what the amount of the unsatisfied claim is. And so in the district court, we asked the district court to say, look, it's already been determined in the bankruptcy court what the unsatisfied portion of the bank's claim is, and that's what Mr. Terry, as guarantor, is liable for. Is the relevant order the confirmation of the plan? It's that order, and there's also a separate order that values the property that CCT. But the relevant order for purposes of your collateral estoppel is the confirmation of the plan, is it not? That and the plan itself, because what the order does is it confirms the plan as proposed by CCT. So there's no real conflict between those statutory provisions, is there? I'm not sure I entirely understand the question, but I don't, in this case... The guarantor, being a stranger to the bankruptcy proceeding, is still on the hook. No, Your Honor, because we're not, again, we're not arguing that the bankruptcy itself, the discharge of the debtor, had any effect on Mr. Terry's case. But you are, if the discharge is the confirmation of the plan, that's the order. I mean, for collateral estoppel, you've got to have a final order. Well, the distinction is this. In a normal bankruptcy, what the law holds is that once the debtor has a confirmed, and this is a Chapter 11 bankruptcy we're talking about, when the debtor has a confirmed plan, the creditor can no longer go after that debtor to recover that debt, because he's been discharged. We're with you there. And then Section 11, or excuse me, 524E, says that if you're a guarantor or a non-debtor, you can't use the fact that the debtor was discharged in bankruptcy to reduce your liability. We're not doing that. We're not using the fact that the bankruptcy order discharged the debtor as affecting the guarantor. We're saying that because in that plan, or in that proceeding, the creditor received property, it's like a payment, no different. And because they received property in that proceeding, which partially at least satisfied the debt, that that should be to the benefit of the guarantor. Because in any other circumstance, the creditor is only entitled to one satisfaction of his claim. And so if the claim is being paid, then the guarantor is not obligated to pay it a second time. That's essentially what we're arguing. Would the case be different if they'd been able to sell it two months later for 60% premium? Well, I think, yes, it could be. And the reason why... You'd have a better case then, wouldn't you? Well, the reason why I say yes is because in the district court, we said that the court isn't, that Mr. Terry is not necessarily bound by the valuation the bankruptcy put on the property. That the property was valued, arguably, at a conservative liquidation value. When in reality, in the district court, Mr. Terry could be entitled to have that property valued at fair market value. And so if the bank received property that was worth more than the 3.75 or whatever it was that was owed, then the claim has been satisfied. It's been paid. Our point throughout this case has been, and I need to stop, I'm beyond time, but if I can make one... Sure, go ahead. Our point is, we're simply trying to prevent the bank from receiving a double recovery or a windfall when the claim has been satisfied. That's our overriding point. Thank you very much. May it please this court? My name is Meredith Coker. I'm here representing Crestcom Bank, which was granted summary judgment on certain issues in the court below. And it's not only the appellee as to Mr. Terry's appeal, but we also cross-appealed on a narrow issue regarding the choice of law determined by the court below. Your Honors, Mr. Blanchard and I have been back and forth on this case for a long time, and he's had several issues and had several issues before you here today. I'm going to keep things simple. We are discussing here Mr. Terry's obligations to Crestcom Bank under a single obligation, the guarantee. And I think that there were several issues proposed by Mr. Terry at the court below and here today that cloud this issue. Both South Carolina law and Georgia law allow competent parties to freely negotiate and come up with the terms of their obligations with each other, particularly in a commercial transaction. Mr. Terry is a sophisticated businessman. He has developed property all with this bank, not only the for it issue in this case, but there were also other loans that were at some point resolved or otherwise dealt with before it got to you, and in fact owned his own mortgage company, but through another entity. So we are not talking about a consumer with a residential mortgage. We are discussing a man who, by his own admission, negotiated terms of the deal on his behalf and those of his LLCs. So with regard to the guarantee, there is no right to notice to Mr. Terry. There is no right to cure. These loans matured. The only cure Mr. Terry or CCT Reserve could have performed was to stroke a check for the full amount of the loans then outstanding. The four corners of each and every one of these guarantee documents, and there were several in 2006 and several in 2009, each show Charleston, South Carolina on the top of the guarantee, each have similar language with regard to notice, rights of the parties, demand for payment, et cetera. Our primary source of error with the lower court was that with the four corners of this document, there was no ambiguity, whether in the choice of law provision or in any of the other obligations therein. In fact, what the lower court did was allow extrinsic evidence and parole evidence to create an ambiguity. Mr. Terry provided evidence that, well, wait, wait, I wasn't in South Carolina. I happened to be in Georgia when I signed that one document. Well, he didn't just happen to be there. He had an office there. He apparently lived there. It wasn't by happenstance. Well, Your Honor, he at one point had residences in Georgia, Florida, and Wyoming. The record is not clear as to which was his primary residence at the time of executing the documents, either in 2006 or 2009. With regard to closings in South Carolina, and I believe the record supports this, the closing actually occurred in South Carolina. Mr. Terry's attorney or other agent had him sign the documents and then return them to Mr. Terry's attorney, Mr. Dodds, in Mount Pleasant, which is just over the bridge from Charleston. Mr. Terry's assistant, Jacqueline Corey, provided an affidavit and FedEx receipts to, I think in the summary judgment motion, that she FedExed all the documents to his attorney in Charleston County. At the time of... Okay, the choice of law is determined by where the document is executed. Correct, Your Honor. We all agree on that? Yes. So this is all a question about where the document was executed. There is only one party that signs on to this document? Yes, Your Honor. The bank doesn't sign on to it? No, Your Honor. It's the bank's, excuse me, the delivery to the bank that completes the transaction. Well, I'm not so sure the bank would say that if he signed the document, put it in his desk and later produced it in discovery. Don't you think the bank would say he executed the guarantee? Well, Your Honor, I don't believe the bank would give him the money without having the original executed guarantee returned to the bank. I believe the acceptance... Well, if he's as good a customer as you say he is, maybe they would. You know, it's in the mail. And they didn't in this case. And moreover... Your whole argument about execution depends not on when a signature, where a signature was, because the bank didn't sign this. Correct. It is what was the last act that made this enforceable. And under the facts of this case, this was a South Carolina closing related to South Carolina properties with a bank that at the time of this appeal had 12 brick and mortar locations in three counties in South Carolina. While his entities were our Georgia companies, they were also domesticated in South Carolina as a condition of this loan. Excuse me, as a condition of the modification that matured in 2011 on the four loans at issue today. Well, what's wrong with the argument that to the extent that there is... I guess you dispute whether or not there's an ambiguity, but if we disagree with you and your client was the drafter of these documents, the district court was correct, right? If in fact you agree with the district court that there's a patent ambiguity in this document, then yes, Your Honor, I have to concede that point. Our assignment of error is the fact that at best... We don't believe there's an ambiguity. At best, it's a latent ambiguity created by the nature and characteristics of this transaction and the actions of Mr. Terry himself. And at that point, you can look at parole evidence including the other loan documents to determine what the actual and original intent of the parties was. And we have cited in our briefs and Mr. Blanchard has proffered in his summary judgment as well the other loan documents, including the opinion letter of Mr. Terry's agent, his selected attorney, that said these documents will be construed under South Carolina law. So if there's an ambiguity, it's certainly not a patent ambiguity. It is not a clear ambiguity from the four corners of this document. If there were no other facts before this court, it would appear that this document was executed in Charleston, South Carolina at a closing table, whether it be with Mr. Dodds in 2009 or Mr. Brush in 2006. Which leads me, Your Honor, also to... And most of the jurisprudence on choice of law provisions and reasonable relation have to do with, of course, plaintiff lives in... defendant lives in Florida, we're going to pick Texas law. While Mr. Terry's office was, in fact, in Georgia, he also maintained offices in South Carolina. Moreover, there just is no reasonable relationship to Georgia and it could not have been the intent of both parties that Georgia law would control a guarantee that's guaranteeing the obligations of a debtor and a lender who are fully within the confines of South Carolina. Has one side or the other... Has Mr. Terry demonstrated that he did execute it in Georgia? He did provide evidence to that, Your Honor. We do not have countervailing evidence that he signed the documents in Georgia. Well, that's... I think we all agree that that's executing. In other words... Okay. Your submission is that, yes, he has evidence that he signed the documents in Georgia. Yes, Your Honor. And you don't have anything to the contrary? No, Your Honor. The record is silent on that and I'm not sure I could. There are FedEx slips. However, he did... The actual delivery of the documents occurred between Mount Pleasant, South Carolina and Charleston, South Carolina. All within a single county in South Carolina. This all is of import because of the attorney's fees? Yes, Your Honor. And in fact, we made clear in the brief that we believe that the ultimate ruling as to liability of Mr. Terry is harmless based on the jurisprudence in Georgia and South Carolina being fairly similar as to the interpretation of contracts. And particularly the interpretation of guarantee agreements. I think that the case law is fairly parallel in that regard. Where it makes a difference in this case is the Georgia statute related to attorney's fees being awarded only in the circumstance of after the maturity of an obligation and providing notice that attorney's fees will be incurred unless there's a cure within, I believe it's 10 days. And our position has to be, since the bank never realized that Georgia law was in play at the time of... When the loans matured, honestly, they had no reason to believe they needed to send that letter. And it was only after Mr. Terry was involved in litigation that the issue of choice of law arose. Your Honor, if I may, and certainly I will defer to you, but I would like to speak very briefly as to Mr. Blanchard's bankruptcy issue. There is, for myriad times he keeps discussing satisfaction in full and discharge and valuations of these properties. And I think the law is very clear in bankruptcy with regard to corporate entities generally don't receive a discharge. And while there was an unsecured claim remaining in the bankruptcy court between Crestcom Bank and CCT Reserve, that had no bearing on the additional amounts that continued to accrue but could not be charged to CCT Reserve. The most obvious example of this is Mr. Terry's position would require the bank to violate 362 by charging post-petition bankruptcy interest. That is a disallowed claim in the bankruptcy court, however, by the guarantee provisions is allowed under obligations running from the guarantor to the lender. And that's primarily a large portion of what that additional claim was in the district court. Your Honor, I see I have a few minutes remaining, but if this court has any further questions. I don't think we do. Thank you very much. Thank you. Your Honor, I will try to be much briefer this time than last time. Just a few points in response. The bank has accepted the benefits of the bankruptcy court's orders. And as part of that proceeding, as part of those orders, the bank was given a discounted valuation of the property that it received as part of those proceedings. What we are essentially asking the court to do is to say that if the bank is going to accept the benefits of the court's orders there, then it should also bear the burdens of those court's orders. The bank should not be allowed to pick and choose which provisions it wants to accept or not accept. Again, this was a confirmed bankruptcy plan. Crestcom had the opportunity to challenge that order on a direct appeal if it had decided to do so. And so that order and the confirmed bankruptcy plan are binding on the bank at this point. As far as the choice of law provision, essentially the bank's argument depends on its position that the traditional choice of law provision, traditional choice of law rules govern this case. And under the South Carolina traditional rules, ordinarily the place where the contract is made claims on the contract. That rule does not apply, however, when the parties include an express choice of law provision in their agreement, which we had in this case. So it does not depend on or does not matter where the contract was made or where it was delivered or any of those types of criteria. We've cited case law in our brief dealing with the what does the term executed mean. There is certainly case law holding that it is equivalent to signing a document. The only, if there is an ambiguity in that provision, the only other interpretation that the case law has adopted is they distinguish between a contract that is executed in the sense that it has been signed and a contract that is executory, that has not been performed. And in this case, the bank is not claiming that you had to perform the guarantee agreement in order for it to be valid or to be binding in the first place. And so the only logical or reasonable construction of the term executed can be that it meant that the document was signed, which happened clearly in Georgia. The evidence is uncontroverted that that's where it happened. My friend alluded to a letter that the Borrower's Legal Counsel sent. That is at page 583 of the joint appendix. I think if you look at that letter, there's one thing that's important about it, is it lists out the particular documents that are part of the loan transaction, which the attorney is saying are controlled by South Carolina law. And it's very conspicuous by absence that it does not list the guarantee agreement. You'll actually see a place where they list out the various documents, and the place where the guarantee agreement would have been was removed. And so I don't consider that to be evidence that South Carolina law should apply to the guarantee agreement. Thank you, Your Honor. Counsel, I notice you have reserved five more minutes. Would you like to be heard? Your Honor, I was simply going to allow that rebuttal time to expire unless the court had any further questions. I think we're all set. Thanks very much. Thank you. We will come down and greet the lawyers and then go to our last case.
judges: Diana Gribbon Motz, Albert Diaz, Andre M. Davis